FILED

2011 Mar-28  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| DALE SHEPARD, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CASE NO. 5:08-cv-0906-SLB** |
| | ) |
| UNITED PARCEL SERVICE, INC. | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM OPINION

This case is before the court on Defendant United Parcel Service's ("UPS") Motion for Summary Judgment.  (Doc. 32.)[1]  In his Complaint, (Doc. 1), plaintiff Dale Shepard asserts the following claims against UPS: (1) discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq.; (2) racial harassment and discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; (3) invasion of privacy; (4) intentional infliction of emotional distress; and (5) negligent hiring, supervision, training and negligent retention.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that UPS's Motion for Summary Judgment, (Doc. 32), is due to be granted with respect to all claims.

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

# I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  STATEMENT OF FACTS[2]

Dale Shepard, an African-American, was originally hired in 1994 as a part-time hourly employee working as a pre-loader/unloader at UPS's Roebuck Center in Birmingham, Alabama.  (Doc. 32-3 at 15-16, 19, 33, Shepard Depo.; Doc. 37-18 at 2-3, UPS Nov. 2006 Position Stmt. to EEOC.)  At all times, Shepard's employment with UPS has been governed

---

[2]As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to plaintiff, the nonmoving party.  *See, e.g., Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).
    Pursuant to the Scheduling Order entered in this case, (Doc. 10-1), the court has omitted facts not supported by a party's citation to the evidentiary record, and, likewise, included facts deemed disputed by a party but not properly controverted by that party's citation to the record. The court has also attempted to reduce the facts to only those that are material for summary judgment purposes.

by a Collective Bargaining Agreement between UPS and the International Brotherhood of Teamsters, a union that represents a large number of UPS employees.  (Doc. 32-3 at 17, Shepard Depo.; Doc. 37-18 at 3, UPS Position Stmt. to EEOC.)

In approximately 1998 or 1999, Shepard was diagnosed with Chronic Myeloid Leukemia ("CML").  (Doc. 32-3 at 25-26, Shepard Depo.)  CML can cause fluctuations in Shepard's white blood cell  counts which weakens his immune system.  (*Id.* at 36-38.)  He takes Gleevac, a chemotheraphy drug, on a daily basis to keep his white blood cell counts under control.  (*Id.*; Doc. 32-4 at 179, 226, Shepard Depo.)  Shepard's medications cause him to experience severe side effects including night sweats, loss of appetite, regurgitating, severe weakness, drowsiness, inability to stay awake, and fever.  (Doc. 32-3 at 38-40, Shepard Depo.; Doc. 32-4 at 179, Shepard Depo.)  Within thirty minutes of taking Gleevac, Shepard is nauseated, sweating, his skin is burning and he becomes so drowsy he has to sleep.  (Doc. 32-4 at 227, Shepard Depo.)  Shepard takes his medication after his work shift at UPS to allow maximum time to recover from the side effects of the medication.  (*Id.* at 226-27.)  Leukemia also causes Shepard's bones to ache to a point of severe pain in bone marrow and joints.  (Doc. 32-3 at 39-40, Shepard Depo.; Doc. 32-4 at 229-30, Shepard Depo.)  Following his CML diagnosis, Shepard took two separate medical leaves from UPS, one for at least a year, and each time received disability benefits under the UPS policy.  (Doc. 32-3 at 30-31, 50-52, Shepard Depo.)

In 1999, Shepard began working as a center clerk in the warehouse at the Roebuck Center performing duties that progress the packages, such as address corrections, and customer and company pickups. (*Id.* at 90-99; Doc. 37-7 at 2, Shepard Job History.) The Collective Bargaining Agreement identifies each job that it covers. (Doc. 32-3 at 19, Shepard Depo.) Clerks are covered union positions under the Collective Bargaining Agreement. (Doc. 37-15 at 11, Collective Bargaining Agreement.)

Around 2003, Guy Sciro, Employee Relations, asked the group of clerks who were working pre-load in the warehouse for volunteers to start working in the office. (Doc. 37-2 at 123-24, Sciro Depo.) Shepard and Dennis Morrow, a white union employee, were selected to move to the office at the same time. (*Id.*; Doc. 32-3 at 120-121, Shepard Depo.; Doc. 32-16 at 102, Mowery Depo.) Shepard worked under Center Manager Mike Boone and Morrow worked under Center Manager Gary Jones. (Doc. 32-4 at 126, Shepard Depo.) Shepard and Morrow both worked as center clerks, performing union duties that advanced the packages in the warehouse, while also performing nonunion duties in the office, including paperwork and answering the phone. (Doc. 32-3 at 101-04, 120-21, Shepard Depo.; Doc. 32-11 at 58-59, 66-67, 69, Morrow Depo.) Shepard had more seniority within UPS and more center clerk experience than Morrow. (Doc. 37-2 at 94, Sciro Depo.) Jeff Poulter, Human Resources Manager, testified that seniority plays a "huge role" within the union environment and is the "determining factor on almost everything," except that if a position has certain qualifications, then that would supersede seniority. (Doc. 32-21 at 278-79, Poulter Depo.)

5

The new duties Morrow and Shepard were performing in the office were nonunion duties.  (Doc. 32-7  ¶ 2, Poulter Decl.)  Sciro testified that UPS prohibits employees from performing nonunion work, and that if his manager told him to remove the union employees from the office, he would have done it.  (Doc. 37-2 at 294-95, 299, 331-333, Sciro Depo.)  When Sciro left the Roebuck facility in 2006, Shepard and Morrow were still performing the nonunion duties in the office.  (*Id.* at 124.)  No one, including the union, had ever complained to Sciro about Shepard and Morrow performing these duties in the office.  (*Id.* at 127, 138-39.)

**Change in Work Duties and Worsening of Medical Condition**

In the summer of 2006, the management team responsible for the Roebuck Center changed.  (Doc. 32-8 at 191, Jones Depo.; Doc. 32-10 ¶ 1, Mowery Decl.)  Jeff Poulter arrived in August 2006 as the Human Resources Manager for the Alabama District.  (Doc. 32-20 at 19-20, Poulter Depo.)  Gary Jones also started working at Roebuck as the Center Manager.  (Doc. 32-8 at 191, 194, 197, Jones Depo.)  Jones reported to Dale Mowery, a Division Manager who was responsible for the Roebuck Center and other centers in the Alabama District.  (Doc. 32-10 ¶ 1, Mowery Decl.; Doc. 32-8 at 197, Jones Depo.)

In a meeting with Boone and Jones in the summer of 2006, it came to Mowery's attention that Shepard and Morrow, both classified as union Clerks, were performing tasks in the Roebuck Center office such as running reports, answering phones and doing paperwork.  (Doc. 32-10 ¶ 2, Mowery Decl.; Doc. 32-16 at 85-86, Mowery Depo.)  UPS

6

contends that UPS Policy does not allow union employees to work in non-union jobs.  (*Id.*)

However, the Collective Bargaining Agreement does not specifically preclude union employees from working in non-union jobs.  (Doc. 37-31 at 214-15, Brawley Depo.; Doc. 37-15, Bargaining Agreement.)  The record suggests that, despite this policy, UPS has had union employees performing non-union work in some capacity at various times, as well as non-union employees performing union tasks.  (Doc. 37-16 at 21-22, 57-60, Witt Depo.)

Dale Mowery told Gary Jones that Shepard and Morrow had to come out of the office because they had to be put in bargaining unit (union) jobs.  (Doc. 32-9 at 270, Jones Depo.; Doc. 32-16 at 86, Mowery Depo.)  Ron Headley, Preload Supervisor, testified that he was informed by Gary Jones that UPS needed only one center clerk, which caused Shepard to be moved out of his position in the office. (Doc. 42-2 at 78-79, 87-88, 142, Headley Mar. 24, 2009, Depo.)  However, Headley testified that people who worked in the office did not report to him, so he did not know exactly what they did and was not really familiar with the different positions in the office.  (*Id.* at 66-67.)

In the summer of 2006, Shepard was moved out of the office to work solely in the warehouse, where he loaded packages.  (Doc. 32-3 at 104-05, Shepard Depo.; Doc. 32-15 ¶ 2, Headley Decl.)  After this move, Shepard performed duties including customer and company pickups, putting packages on floats and 3-tiers and other duties consisting of holds, will calls, and working on the 300 belt.  (Doc. 32-4 at 104-06, 128-129, Shepard Depo.)  These duties are within the classification of the Operations Clerk position at UPS, a union

position sometimes alternately referred to as a Center Clerk.  (Doc. 32-6 ¶¶ 7, 17, Burnett Decl.; Doc. 32-7 ¶¶ 4, 5, 13, Poulter Decl.; Doc. 32-12 at 314-16, Bundrum Depo.; Doc. 32-14 at 106-08, Boone Depo.)  The essential job functions of an Operations Clerk require that an employee be able to lift and manipulate packages weighing up to 70 pounds, assist in moving packages weighing up to 150 pounds, and work in an environment with variable temperatures and humidity, exposure to dust, dirt, fuel, fumes, and noise, and inclement weather.  (Doc. 32-7 at 5 ¶ 5, Poulter Decl.; 32-7 at 15, Ex. A to Poulter Decl.)

Morrow testified that he recalls being told on the same day as Shepard that he had to move out of the office, and remembers moving out of the office the following day.  (Doc. 32-11 at 90-91, Morrow Depo.)  Morrow continued to work in the office to perform call tags, a non-union duty, when needed to fill in for someone who was sick.  (*Id.* at 95.)  After moving from the office, both Morrow and Shepard continued to be classified as Center Clerks and performed duties in the warehouse within the union clerk job classification.  (Doc. 37-7 at 2, Shepard Employee History Profile; Doc. 37-17 at 2, Morrow Employee History Profile.)

Shortly after Shepard was moved from the office back to the warehouse, Shepard's medical condition fluctuated again; he began to experience problems with his back, and was told by his doctors that his kidneys were "holding cancer cells" and he "needed to lighten up on the work as far as lifting and doing things."  (Doc. 32-4 at 130, Shepard Depo.)  Shepard told Jones that he could not work in the warehouse because of his leukemia and the heat.

(Doc. 32-9 at 290, 325, Jones Depo.)  On August 4, 2006, Roger Burnett, the Occupational Health Supervisor for the District, was notified by Jones that Shepard's illness was making it difficult for him to perform his job.  (Doc. 32-6 ¶ 3, Burnett Decl.; Doc. 32-18 at 90-91, Burnett Depo.)

Shepard provided Gary Jones with a copy of a letter dated August 4, 2006, from his oncologist, Elliott Winton, who was treating Shepard's leukemia.  (Doc. 32-4 at 133-34, Shepard Depo.; 32-5 at 3, Shepard Depo., Ex. 2.)  Doctor Winton's letter indicated that Shepard was under his care for "severe seizure disorder and Chronic Mylegenous Leukemia" and that Shepard "has been advised to avoid extremely stressful situations and extremes of temperature including heat."  (*Id.*)  No other information regarding Shepard's condition was provided by Dr. Winton at that time.  (*Id.*)

UPS has an Americans with Disabilities Act Procedural Compliance Manual that it developed to put forth guidance on key concepts under the ADA such as "reasonable accommodation."  (Doc. 37-11 at 9, ADA Manual.)  The introduction to the Manual states that it is not intended to establish mandatory ADA procedures, but rather "suggests recommended but flexible procedures to encourage the prompt and equitable resolution of all requests for accommodation."  (*Id.*)  The Manual further states that "individuals are entitled to no contractual rights or guaranteed procedures as a result of this manual that they are not otherwise entitled to as a matter of law."  (*Id.*)  The ADA Manual recommends that UPS acknowledge ADA accommodation requests within a week of receipt of the request and

9

also request additional medical information within a week.  (Doc. 37-11 at 51, ADA Manual.)

Burnett made an appointment for Shepard to see M.L. Cloyd, M.D., at St. Vincent's Hospital on August 18, 2006 for a short-term disability fit-for-duty examination.  (Doc. 32-19 at 487, Burnett Depo.; Doc. 32-6 at 4 ¶ 5, Burnett Decl.)  However, before Dr. Cloyd reported back to UPS, Burnett received a request for absence from work submitted on behalf of Shepard by Dr. Amy LeJeune of UAB Health Center.  (Doc. 32-6 at 4 ¶ 5, Burnett Decl.; *id.* at 20, Burnett Decl., Ex. C.)  The Absence Authorization form submitted by Dr. LeJeune indicated only that Shepard was under her care and she requested he be excused from work for the period of August 21, 2006 to August 24, 2006.  (Doc. 32-6 at 20, Burnett Decl., Ex. C.)  UPS granted Shepard the requested leave.  (*Id.* at 4 ¶ 5, Burnett Decl.)

On or about September 6, 2006, Burnett received a letter dated September 1, 2006 from Dr. Cloyd, reporting on the results of his August 18th fitness for duty examination of Shepard.  (*Id.* at 4-5 ¶¶ 6-7; Doc. 37-6, Cloyd Letter.)  Dr. Cloyd's correspondence states, "He has a 10-year history of chronic myelogenous leukemia, and is being treated by Dr. Winton at the Winship Cancer Institute at Emory.  He also has a seizure disorder, which he tells me was 'due to stress'.  He hasn't had a seizure in 3 years."  (Doc. 37-6, Cloyd Letter.) Dr. Cloyd further reported that Shepard was having problems with the following aspects of his job: (1) lifting greater than 50 pounds; (2) the work is paced and therefore stressful for him; and (3) the extremes of heat and cold.  (*Id.*)

10

**Shepard's Subject Period of Leave**

After receiving the letter from Dr. Cloyd, UPS claims that it placed Shepard on a medical leave of absence starting on September 8, 2006, and allowed him to make a claim for short-term disability benefits while UPS looked further into the possibility of an ADA accommodation.  (Doc. 32-6 at 5 ¶¶ 8, 10, Burnett Decl.)  Shepard claims, however, that Jones and Burnett told him it was in the best interest of the company for him to go home and that they would help him get disability benefits.  (Doc. 32-4 at 131-32, 143, Shepard Depo.; Doc. 37-8 at 3, Letter to Ron Headley.)  Shepard claims that Burnett and Jones told him that UPS could not risk him being there working and the possibility of his health affecting the company, so they would rather that he go home.  (Doc. 32-4 at 140, 143, Shepard Depo.)  Shepard then informed Burnett, Jones, and Ron Headley that he had an appointment with his treating physician the following Monday, and Jones told Shepard that he could return to work if Shepard could bring Jones a doctor's note that said he could work full duty without any restrictions.  (*Id.* at 143-44.)  It is undisputed that Shepard did not ask to leave work or be placed on disability and that he informed Jones, Headley, and Burnett that he wanted to work with limitations as to the weight lifting.  (*Id.* at 140; Doc. 32-18 at 167, Burnett Depo.)  Shepard also told Jones, Headley, and Burnett that his kidneys were "holding cancer cells" and causing him to have back pains.  (Doc. 32-4 at 140, Shepard Depo.)

After discussing Shepard's medical issues, Jones asked Shepard if he could ask him something off the record, and Shepard said, "Sure."  (*Id.* at 141, Shepard Depo.; Doc. 32-9

at 340-41, Jones Depo.)  Jones then asked Shepard, "How is your salvation?"  (Doc. 32-4 at

141, Shepard Depo.)  Shepard answered that his salvation was fine, saying that he had to

have faith and believe, and that he had been blessed and knew who was in control of his life.

(*Id.*)  After Shepard said this, Shepard claims that Jones sat back and smirked at Shepard,

"like there was something funny about it."  (*Id.*)  Jones testified that, after realizing the

severity of Shepard's condition, his heart went out to him.  (Doc. 32-9 at 338-41, Jones

Depo.)  Debbie Bundrum, a District Workforce Planning Manager at UPS, testified that it

would violate UPS's policies for Jones to ask Shepard about his salvation.  (Doc. 32-12 at

65-66, Bundrum Depo.)

Burnett expected that Shepard would quickly be granted short-term disability benefits,

just as he had been granted benefits in the past.  (Doc. 32-6 at 6-7 ¶ 10, Burnett Decl.)

Instead, Burnett was notified by the insurance company in October 2006 that Shepard's claim

was being denied because there was a "lack of medical exam finding to indicate there was

a functional impairment that would preclude the claimant from performing the core functions

of her [*sic*] own occupation."  (*Id.*; Doc. 32-6 at 28, Burnett Decl., Ex. F.)

On October 5, 2006, Debbie Bundrum sent Shepard a letter acknowledging his request

for an accommodation and requesting additional medical information.  (Doc. 32-6 at 30,

Burnett Decl., Ex. G.)  Enclosed with Bundrum's letter was a Request for Medical

Information form to be completed by Shepard's doctor.  (*Id.* at 31.)  On November 2, 2006,

UPS received the completed Request for Medical Information form signed by Dr. Winton.

(Doc. 32-6 at 137-39, Burnett Decl., Ex. J.; Doc. 32-6 at 8 ¶ 14, Burnett Decl.)  One question on the form asked, "Is the employee currently able to perform all of the physical and mental functions of his/her position?"  (Doc. 32-6 at 137, Burnett Decl., Ex. J.)  Dr. Winton answered this question by checking the box indicating "Yes," and wrote in the space next to the box, "Request that he lifts less than 50 lbs rather than 70 lbs."  (*Id.*)  In response to another question, asking for specific information regarding any functions the employee was unable to perform, Dr. Winton made handwritten notations that appear to say, "It is requested he lift less than 50 lbs and avoid walking in exre."[3]  (*Id.*)  At another place on the form, under the heading "Description of Job Restriction," Dr. Winton wrote "no lifting of greater than 50 lbs" and that Shepard should "avoid working in extreme heat greater than 90 degrees." (*Id.* at 138)  Dr. Winton did not clarify whether Shepard's restrictions were temporary, stating on the form that their duration was unknown.  (*Id.*)  Finally, Dr. Winton stated on the form that Shepard was not substantially limited in his ability to perform any major life activities other than working.  (*Id.*)

UPS claims that the inconsistencies, incomplete statements and uncertainty regarding the expected duration of Shepard's medical restrictions as reflected on the form submitted by Dr. Winton prevented UPS from determining if Shepard was a qualified person with a disability under the ADA.  (Doc. 32-6 ¶ 16, Burnett Decl.)  Burnett made several phone calls to Dr. Winton's office to obtain clarification, but did not receive a return call or any

---

[3]  The last word or abbreviation, which the parties agree reads "exre," is particularly illegible.

additional information from Dr. Winton.  (*Id.*)  On January 8, 2007, Burnett wrote Dr. Winton and Dr. LeJeune, enclosing the Essential Job Functions lists for eight different union positions at the Roebuck Center which, putting aside his medical restrictions, Shepard could otherwise occupy if they were available.  (*Id.* at 10 ¶ 17; Doc. 32-6 at 144-53, Burnett Decl., Ex. K; Doc. 37-22 at 2-10, Pla. Ex. 21.)  Burnett requested that they review the lists to determine if they could release Shepard to perform the essential job functions for any of the eight positions.  (Doc. 32-6 at 144, Burnett Decl., Ex. K; Doc. 37-22 at 2-10, Pla. Ex. 21.)

A month later, Burnett received a letter from Dr. Winton dated February 6, 2007, wherein Winton stated, "I am sending back the Job description entitled 'Operations Clerk' because this is the job Mr. Shepard would prefer.  He has been released to return to work and can perform all these Essential Job Functions at this time."  (Doc. 32-6 at 155, Burnett Decl., Ex. L.)  Dr. Winton attached the Essential Job Functions list for the Operations Clerk position to his letter, but marked up the list to make modifications.  (*Id.* at 156.)  Specifically, where the list recited that an employee must "lift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds," Dr. Winton wrote, "occasionally." (*Id.*)  He also wrote the word "occasionally" next to another essential job function which states that an employee must "assist in moving packages weighing up to 150 pounds."  (*Id.*) Further, next to the lines which states that the position requires an employee to "work in an environment with: variable temperature and humidity (climatic conditions); exposure to dust,

dirt, fuel, fumes, and noise; [and] outside, inclement weather," Dr. Winton wrote: "for short durations on an infrequent basis." (*Id.*)

Burnett made an appointment for Shepard with Dr. Cloyd for February 16, 2007 so that Cloyd could reexamine Shepard and review the information UPS received from Dr.Winton.   (Doc. 32-6 at 11-12, Burnett Decl.)   Dr. Cloyd sent Burnett a letter dated February 22, 2007 regarding his examination of Shepard and review of Dr. Winton's release. (Doc. 32-6 at 159, Burnett Decl., Ex. M.)   Dr. Cloyd noted in his letter that the handwritten notes on the sheet containing the essential functions of the Operations Clerk position sent by Dr. Winton appeared to qualify Dr. Winton's conclusion that Shepard could perform the essential functions of that position. (*Id.*)   He wrote, "The qualifiers . . . were handwritten on the job description, I'm not sure by whom.   I would disagree with Dr. Winton's statement that he 'can perform all these Essential Job Functions at this time', unless someone other than Dr. Winton added the qualifiers noted above." (*Id.*)

On May 2, 2007, Bundrum sent Shepard correspondence indicating UPS delayed processing his accommodation request because of conflicting information provided by Shepard's health provider.  (Doc. 37-24, Bundrum Letter.)  In the letter, Bundrum stated that UPS had made a preliminary determination that Shepard might be eligible for accommodations, and invited him to a May 7, 2007 meeting with UPS to discuss the specifics of his accommodation request. (*Id.*) During the May 7 meeting, Shepard confirmed that he had been diagnosed with CML nearly ten years earlier and that, at the present time,

he was having difficulty lifting heavy packages and working in the heat.  (Doc. 32-7 at 11, Poulter Decl.)

After the meeting, Poulter started looking at different jobs that were under the union Collective Bargaining Agreement to try to come up with a job or position that met the Agreement and would meet Shepard's accommodations.  (Doc. 32-20 at 141, Poulter Depo.)  Poulter testified that he took work that needed to be done and took tasks from different jobs to meet Shepard's restrictions.  (*Id.* at 143, 145, 149, 183-84.)  Poulter placed Shepard in the warehouse working under a fan performing tasks with minimal lifting, such as sorting packages weighing less than ten pounds.  (*Id.* at 143-44; Doc. 32-4 at 193-94, Shepard Depo.)  In this new role, Shepard was not required to lift packages weighing more than 50 pounds.  (Doc. 32-7 at 11-12 ¶ 16, Poulter Decl.; Doc. 32-4 at 194, Shepard Depo.)  Shepard accepted the new role and returned to work at the Roebuck Center in July 2007.  (Doc. 32-7 at 11-12 ¶ 16, Poulter Decl.)  Upon his return to work, Shepard continued to be classified as a clerk until December 2007, when his Job History reflects a change to the Job Class "Sorter - AM."  (Doc. 37-7 at 2, Shepard Job History; Doc. 32-4 at 195, Shepard Depo.)

UPS contends that throughout the time that Shepard was on medical leave of absence, from September 2006 to the summer of 2007, there were no available jobs at the Roebuck Center which he could have performed with or without reasonable accommodation.  (Doc. 32-7 at 8 ¶ 11, Poulter Decl.)  Mowery testified that a union customer counter position became available at some point while Shepard was on leave, but the essential job functions

16

of a clerk on customer counter included lifting up to 70 pounds.  (Doc. 32-17 at 299-300, Mowery Depo.; Doc. 42-3 at 3, Mowery Errata Sheet.)

The primary role of union employees at UPS is to track and advance packages.  (Doc. 32-7 at 8-9, Poulter Decl.; Doc. 32-14 at 104-05, Boone Depo.; Doc. 32-9 at 301, Jones Depo.)  The essential job functions of the union positions at the Roebuck Center require that an employee lift, lower, push and pull equipment and packages weighing up to 70 pounds and assist in moving up to 150-pound packages.  (Doc. 32-7 at 8-9, Poulter Decl.)  The union jobs at the Roebuck Center are performed in the warehouse, a metal building which is not air-conditioned and which can become at least as hot as the outside temperature during warm seasons and very cold during the winter months.  (Doc. 32-7 at 9, Poulter Decl.; Doc. 32-12 at 317, Bundrum Depo.)      Since package cars and other trucks and equipment are operating within and outside the warehouse, it is unavoidable that warehouse employees are exposed to dust, dirt, fuel, fumes and noise.  (Doc. 32-7 at 9, Poulter Decl.)

After Shepard returned to work in the summer of 2007, Poulter made arrangements to have UPS pay him in full for his lost time from work and personally forwarded Shepard a paycheck which made him whole for any alleged lost income attributable to his having been placed on a leave of absence.  (Doc. 32-7 at 12 ¶ 17, Poulter Decl.)  Shepard also testified that UPS reimbursed him for his medical expenses incurred while on leave.  (Doc. 32-4 at 216, Shepard Depo.)

17

Shepard filed a Charge of Discrimination with the EEOC on September 29, 2006. (Doc. 37-25, EEOC Charge.)  In September 2007, the EEOC issued a Cause Determination, stating that reasonable cause existed to support a finding that a violation of the ADA had occurred regarding UPS's failure to allow Shepard to work between September 2006 and June 2007.  (Doc. 37-29, EEOC Determination.)

Shepard has provided evidence showing that another UPS employee, Adrian Mableton, an African-American, filed a Charge of Discrimination with the EEOC in 2009, claiming that Jones discriminated against him on the basis of race when Jones approved Mableton to work two additional hours in order to deliver a package and then reprimanded him for the same act and that Jones's actions were in retaliation for Mableton's filing a previous EEOC charge.  (Doc. 37-26, Mableton EEOC Charge.)

Shepard filed this lawsuit on May 23, 2008, alleging disability discrimination, race discrimination, invasion of privacy, outrage, and negligent hiring, supervision, training and retention against UPS.  (Doc. 1-1 at 6-16, Compl.)  As relief for the various claims, Shepard seeks a permanent injunction, declaratory relief, reinstatement, back pay, front pay, compensatory damages (including damages for mental anguish), punitive damages, interest, attorneys' fees, expenses and costs, and any "additional relief and benefits as justice may require."  (Doc. 1-1 at 9, Compl.)

## III.  DISCUSSION

### A.  Discrimination under the Americans with Disabilities Act

18

Shepard claims he was discriminated against in violation of the ADA because of his disability and/or perceived disability due to UPS's "denial of a reasonable accommodation, denial of a position, . . . refusal to allow the plaintiff to work, harassment, [and] being removed from his Clerical position." (Doc. 1-1 at 8, Compl.) The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, "disability" is defined as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarding as having such an impairment." 42 U.S.C. § 12102(1).

An ADA plaintiff may prove a claim for discrimination by presenting direct evidence of discrimination or through the use of circumstantial evidence. *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1420 (M.D. Ala. 1996) (citations omitted); *see Haynes v. W.C. Caye Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995). Direct evidence is "that evidence which, if believed, 'establishes discriminatory intent without inference or presumption.'" *Gayfers*, 953 F. Supp. at 1421 n.10 (citing *Clark v. Coats & Clark*, 990 F.2d 1217, 1226 (11th Cir. 1993)); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (listing cases where the Eleventh Circuit has found direct evidence of race and sex discrimination in employment and quoting the statements found to amount to direct evidence). For example, in an ADA case, a decisionmaker's blanket statement that people

with a certain disability are not competent to perform a particular job would amount to direct evidence of discrimination. *Cf. Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995) ("[A] statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence [of discriminatory intent].").  Motive or intent is seldom capable of proof by direct evidence.  *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1141 (11th Cir. 1983). "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Merritt*, 120 F.3d at 1189 (citations omitted).

The plaintiff in a direct evidence case "must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990).  "If the plaintiff produces such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved." *Id.*

Shepard claims that Jones and Burnett's statements to him when placing him on leave in September 2006 constitute direct evidence of disability discrimination.  (Doc. 53 at 14.) Shepard testified that Burnett and Jones told him that "in the best interest of the company, they couldn't risk me being there and working, so they would rather that I go home.  They were sending me home and they would help me get disability." (Doc. 32-4 at 140, Shepard

Depo.)  Shepard also testified that they told him "that it was best for me not be working for them.  They couldn't risk damages and lawsuits.  They couldn't risk me, my health affecting - me working and the possibility of my health being an effect on the company."  (*Id.* at 143.)

These statements do not amount to direct evidence of discrimination, as they, at most, only *suggest* discrimination.  *Merritt*, 120 F.3d at 1190 (evidence only suggestive of discrimination does not constitute direct evidence); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (citation omitted) (noting that an example of direct evidence of age discrimination would be a management memorandum stating, "Fire [plaintiff]- he is too old.").  In *Wascura v. City of South Miami*, the Eleventh Circuit failed to find direct evidence of discrimination under the ADA where the plaintiff's supervisor told her, "Things aren't right. I don't want you here. I want you to resign. And if you need an excuse, you can use what's going on at home." 257 F.3d 1238, 1242 n.2 (11th Cir. 2001).  The court stated that these statements were "at most weak circumstantial evidence of discrimination."  *Id.*  Similarly, Burnett and Jones's alleged statements are not direct evidence because they do not establish discriminatory intent "without inference or presumption."  *Gayfers*, 953 F. Supp. at 1421 n.10 (citations omitted).  While the statements show that Burnett and Jones had concerns about allowing Shepard to continue to work after finding out about his medical restrictions, they do not amount to a blanket statement that UPS believes employees with leukemia are unfit to perform their jobs.  Therefore, the court finds

that this evidence is more appropriately deemed circumstantial or indirect evidence, and, as such, may properly be used under a burden-shifting analysis of proof.

**1. Prima Facie Case**

The employee bears the burden of establishing a prima facie case of disability discrimination by a preponderance of the evidence. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *Reed v. Heil Co.,* 206 F.3d 1055, 1063 (11th Cir. 2000). To meet this burden, Shepard must prove (1) he has a disability (real or perceived); (2) he is otherwise qualified to perform the essential functions of the job; and (3) he was subjected to unlawful discrimination because of his disability (real or perceived).  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002); *Davis*, 205 F.3d at 1305.

**a. Disability**

Although UPS mainly contests Shepard's ability to prove that he is a qualified individual and that he was denied a reasonable accommodation, UPS briefly argues in a footnote that Shepard has not provided sufficient evidence to demonstrate that he is disabled within the meaning of the ADA.  (Doc. 32-1 at 19 n.4.)  Under the ADA, a plaintiff is disabled if he (1) has a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1).  Shepard argues that he is disabled under any of the three definitions.  In evaluating disability, the court must look to

the facts as of the time of the alleged discriminatory act. *Garrett v. Univ. of Alabama at Birmingham Bd. of Trustees*, 507 F.3d 1306, 1312 (11th Cir. 2007).

1. Actual Disability

Disability under the first definition requires a three-step analysis. *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)). First, the plaintiff must be impaired. *Id.* Second, "the court must identify the life activity that the plaintiff claims has been limited and determine whether it is a major life activity under the ADA." *Id.* "Finally, the court must determine whether the impairment 'substantially limits' that life activity." *Id.* The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment, but rather on the effect of that impairment on the life of the individual. *Pritchard v. Southern Company Servs.*, 92 F.3d 1130, 1132 n.3 (11th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(App.)). The Supreme Court has held that the term "disability" is to be "interpreted strictly to create a demanding standard for qualifying as disabled." *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by* ADAAA, Pub. L. No. 110-325, 122 Stat. 3353 (2008)).[4]

---

[4] The ADA Amendments Act of 2008 ("the ADAAA"), Pub. L. No. 110-325, 122 Stat. 3353, became effective on January 1, 2009. The ADAAA specifically rejects as inappropriately narrow and restrictive the disability standards articulated by the U.S. Supreme Court in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). All of the conduct alleged in the Complaint occurred before the ADAAA became effective. Plaintiff has not argued that the ADAAA applies to his claims, and

Shepard contends that his leukemia substantially limits his ability to perform the major

life activities of sleeping, eating, and working.  The Eleventh Circuit has recognized cancer

as a physical impairment under the ADA.  *Hilburn v. Murata Electronics North Am., Inc.*,

181 F.3d 1220, 1231 (11th Cir. 1999) (in ADA case, citing the commentary to the federal

guidelines for the Rehabilitation Act, 45 C.F.R. pt. 84, App. A, subpt. (A)(3) (1997)).[5]  While

leukemia is of course a serious health condition, depending on the facts, it may not amount

to a disability under the ADA.  *See Garrett v. Univ. of Alabama at Birmingham Bd. of*

*Trustees*, 507 F.3d 1306, 1315 (11th Cir. 2007) (affirming summary judgment for defendant

employer on plaintiff's Rehabilitation Act claim, stating, "While the side effects that

[plaintiff] suffered as a consequence of his chemotherapy treatments may qualify as 'physical

impairments' under the ADA, we hold that such impairments did not substantially limit his

ability to care for himself or to work.")

the majority of courts addressing the issue have held that the ADAAA is not retroactive. *See, e.g., E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009); *Kiesewetter v. Caterpillar Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008); *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 494 (6th Cir. 2008); *Geoghan v. Long Island R.R.*, No. 06-CV-1435, 2009 WL 982451, at *8-9 (E.D.N.Y. Apr. 9, 2009) (Pollak, M.J.). While the Eleventh Circuit Court of Appeals has not addressed the issue in a published opinion, the court's ruling in an unpublished decision suggests that the ADAAA does not apply retroactively. *Fikes v. Wal-Mart, Inc.*, 322 Fed. Appx. 882, 883 n.1 (11th Cir. 2009) ("Plaintiff makes no argument that the amendments should apply retroactively; and absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'").  Therefore, like the *Fikes* court, "[W]e look to the ADA as it was in effect at the time of the alleged discrimination." *Id.*

    [5] "Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably." *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009).

An impairment substantially limits a major life activity if the plaintiff is "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." *Rossbach*, 371 F.3d at 1357 (quoting 29 C.F.R. § 1630.2(j)(1)). Factors to consider in determining whether an impairment "substantially limits" a major life activity are (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2). The restriction on the major life activity must be a result of the impairment. *Id.* at § 1630.2(j)(App.). Courts look to the ADA's implementing regulations to determine the functions that qualify as major life activities. *Littleton v. Wal-Mart Stores, Inc.*, 231 Fed. Appx. 874, 876, 2007 WL 1379986 (11th Cir. May 11, 2007). A major life activity is a basic activity that an average person in the general population can perform with little or no difficulty, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i)(App.).

The Eleventh Circuit has held that sleeping qualifies as a major life activity under the ADA. *Nadler v. Harvey*, 2007 WL 2404705 (11th Cir. Aug. 24, 2007).[6] Because "[d]ifficulty sleeping is extremely widespread," a plaintiff must present evidence "beyond

---

[6] Although *Nadler* is a Rehabilitation Act case, the standard for analyzing Rehabilitation Act disability employment discrimination claims is the same as that for ADA disability discrimination claims. *See Sutton v. Lader*, 185 F.3d 1203, 1208 n.5 (11th Cir. 1999); *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996) (noting that the ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations).

vague assertions of 'a rough night's sleep' or a need for medication, 'that his affliction is []

worse than [that] suffered by [a] large portion of the nation's adult population.'" *Id.* at *6

(quoting *Rossbach*, 371 F.3d at 1358).  Sleeping an average of five and a half to six and a

half hours a night has been held to be insufficient to amount to a substantial limitation on the

major life activity of sleeping.  *Id.* at *2.  The Eleventh Circuit has also recognized the

possibility that eating may be a major life activity under the ADA.  *Collado v. United Parcel

Service, Co.*, 419 F.3d 1143, 1155 (11th Cir. 2005) (where plaintiff claimed that his diabetes

substantially limited his ability to eat normally and digest food, but admitted that he can eat

normally as long as he takes insulin, court stated, "Assuming that eating is a major life

activity. . . Collado's argument fails because his testimony did not provide a reasonable basis

for the jury to find that his diabetes substantially impaired his eating.")

Shepard's deposition testimony reveals that his chemotherapy medication causes him

to experience night sweats, loss of appetite, regurgitating, severe weakness, drowsiness,

inability to stay awake, and fever.  He also testified that, within thirty minutes of taking the

medication, which he has to take every day, he experiences severe nausea and drowsiness and

has to sleep.  Shepard's testimony does not go into further detail about the extent or

frequency of these ailments, and his medical records do not provide any more information.

In October 2006, Dr. Winton in fact represented to UPS that Gleevac, Shepard's

chemotherapy medication, has "very few side effects."  (Doc. 32-5 at 20.)  Without more

detailed information regarding the extent to which the plaintiff's abilities are limited, the

26

court cannot conclude that Shepard is substantially limited with regards to eating and sleeping.  The Eleventh Circuit has held that "[a plaintiff's] testimony of limitations couched in vague terms is insufficient, particularly in the absence of evidence that a described affliction is worse than is suffered by many adults."  *Garrett*, 507 F.3d at 1315.  Since Shepard's testimony as to his sleeping and eating limitations is vague and unsupported by any medical documentation, Shepard has not met his burden of proving that he is substantially limited with regards to eating and sleeping.[7]

Working qualifies as a major life activity, but in order for an impairment to substantially limit an individual's ability to work, the plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (per curiam) (11th Cir. 2004).  If jobs utilizing an individual's skills are available, that individual is not considered substantially limited in his ability to work.  *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000).

---

[7]  While Shepard directs the court to Burnett's deposition testimony stating that sleeping and eating were major life activities and answering hypothetical questions relating to how various health conditions would impact these activities, (Doc. 32-18 at 147-50, Burnett Depo.), such conclusory opinion testimony is irrelevant to the court's determination of the legal issues of major life functions and their limitations under the ADA.  Hypothetical questions directed at Burnett regarding Shepard's alleged state are also unsupportive of Shepard's own experiences as to his health condition, which must be considered in determining whether he is disabled under the ADA.

A "class of jobs" is defined as: "The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of an impairment."  29 C.F.R. § 1630.2(j)(3)(ii)(B). A "broad range of jobs in various classes" is defined as: "The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from the individual is also disqualified because of the impairment."   29 C.F.R. § 1630.2(j)(3)(ii)(C).

Shepard's medical records focus on his health problems pertaining specifically to his position in the warehouse, referencing his difficulty lifting more than 50 pounds due to periodic weakness and his problems with extreme temperatures and stressful situations. (Doc. 32-5 at 3, 7, 18, 19, 34, 35, Exs. to Shepard Depo.)  In *Greene v. United Parcel Service*, a case  with great factual similarity to Shepard's, the court found that the plaintiff was not substantially limited as to the major life activity of work where he did not show that his physical restrictions prevented him from performing a class of jobs or a broad range of jobs. 125 F. Supp. 2d 517 (M.D. Ga. 2000).  The plaintiff worked at a UPS package center as an unloader, a position that required him to be able to continuously lift, lower, and carry packages weighing up to 70 pounds.  *Id.* at 519.  After plaintiff suffered from an aneurysm and a spinal disc herniation, plaintiff's doctor released plaintiff to work, but imposed the

following permanent restrictions: no lifting more than twenty pounds, light duty work with frequent lifting of only ten pounds, and occasionally lifting up to twenty pounds. *Id.* After receiving information on plaintiff's medical restrictions, UPS determined that plaintiff's lifting limitations precluded him from performing the requested jobs at the UPS center where he worked. *Id.* The plaintiff brought suit under the ADA, alleging UPS failed to accommodate him because they denied him the positions he requested. *Id.* Although the plaintiff presented expert testimony showing he was only eligible for 15 percent of the jobs in the local labor market, the court held that the plaintiff was not substantially limited in the major life activity of work, stating,

> Plaintiff has not met his burden of producing evidence that addresses the factors listed in the regulations or that otherwise suggests that his impairments substantially limit his ability to work. Although Plaintiff is disqualified from jobs that require lifting over twenty pounds, he has not shown that he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

*Id.* at 523.

Similarly, Shepard has not met his burden of proving that he is restricted from a broad range of jobs or class of jobs. As the court held in *Greene*, while the evidence shows that Shepard is restricted from performing his desired job at UPS, Shepard has not shown that he is significantly restricted in his ability to perform a broad range of jobs. *See* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."). In opposition to summary

29

judgment, plaintiff points out that all eight job descriptions that Burnett sent to Dr. Winton and Dr. LeJeune in January 2007 require lifting up to 70 pounds and working in variable temperatures.  (Doc. 53 at 9.)  Plaintiff argues, "It is clear from this documentation, UPS's *own job classification descriptions*, not only Plaintiff's specific classification of 'operations clerk,' but a broad range of jobs required him to lift and work in the heat, which he was precluded from doing by his disabili[t]y."  (*Id.*) (emphasis in original.)  As the court held in *Greene*, it is insufficient to show that an impairment disqualifies a plaintiff from all jobs available at the plaintiff's job site. The plaintiff bears the burden of showing that he is disqualified from performing a class of jobs or broad range of jobs in a geographical area, and Shepard has given the court no information regarding "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area."  29 C.F.R. § 1630.2(j)(3)(ii).  Shepard "concedes that for some jobs, lifting and temperature restrictions would not limit the life activity of working," using the example of an attorney. Shepard then argues, "However, at Shepard's skill level and with his job experience, these limitations precluded him from a broad range of jobs."  (Doc. 53 at 10 n.6.)  The court is unpersuaded by this argument, as there are many desk jobs that do not require the skill level of an attorney; indeed, Shepard was performing some type of desk job during at least part of his shift before being moved to the warehouse full-time.

The basis of this lawsuit is that Shepard claims that he should have been accommodated by being allowed to continue working in the office, instead of being moved

to the warehouse.  Dr. Cloyd also requested that Shepard be moved to an office environment. (Doc. 32-5 at 7, Letter from Dr. Cloyd).  Because Shepard has requested to continue working, either in the Operations Clerk position with lifting restrictions or in the office, the court cannot conclude that Shepard is substantially limited in the major life activity of work. *See Hilburn v. Murata Electronics of North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (plaintiff was not substantially impaired in major life activity of working or precluded from class of jobs that required heavy lifting where her doctor imposed a ten pound lifting restriction but plaintiff asserted that she was still able to work).  Shepard's restrictions as to avoiding stressful situations, extremes of temperature, and exposure to dust, dirt, fuel, fumes and noise also do not render him substantially limited as to the major life activity of working. *Boykin v. Honda Manufacturing of Ala.*, 288 Fed. Appx. 594, 597 (11th Cir. July 29, 2008) (plaintiff's COPD did not substantially limit him in the major life activity of working because he was fully capable of working anywhere that did not expose him to the heat, humidity, dust, and pace of the Honda manufacturing line, showing he was not disqualified from a class of jobs).

Because the court has concluded that Shepard does not have an actual disability under the ADA, Shepard may only establish that he was disabled if he has a record of an impairment or if he was regarded as disabled by UPS.

2. Record of impairment

Shepard also alleges that UPS discriminated against him due to Shepard's record of a disability or because he was regarded as disabled. (Doc. 1-1 at 8 ¶ 20, Compl.) A plaintiff who has a record of an impairment has "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Hilburn*, 181 F.3d at 1229 (quoting 29 C.F.R. § 1630.2(k) (1997)). "This part of the definition of disability is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment . . . There are many types of records that could potentially contain this information, including but not limited to, education, medical or employment records." *Id.* (citing 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997)). Importantly, however, "whether [the plaintiff] is proceeding under a classification or misclassification theory, "the record-of-impairment standard is satisfied only if [the plaintiff] actually suffered a physical impairment that substantially limited one or more major life activities." *Id.*

While UPS has received medical records from Dr. Cloyd and Dr. Winton regarding Shepard's condition, they do not establish that he had an impairment that rises to the level of a disability under the ADA. *See Carr v. Publix Super Markets, Inc.*, 170 Fed. Appx. 57, 61 (11th Cir. Feb. 6, 2006) (per curiam) ("Neither the x-rays or lifting restriction set out in the physician's note presented by Carr to Publix show a substantial limitation sufficient to establish a record of a disabling impairment."). In *Pritchard*, the court held that, where an

32

employer placed an employee on disability leave instead of accepting the employee's resignation, there was evidence that the employee had a record of being impaired and that her employer regarded her as impaired.  92 F.3d at 1134.  However, the plaintiff in *Pritchard* had also succeeded in creating a genuine issue of material fact concerning whether she was substantially limited in a major life activity, which Shepard has failed to do.  Accordingly, the court cannot find that Shepard had a record of a substantially limiting impairment.  *See Hilburn*, 181 F.3d at 1229-30 (rejecting plaintiff's reliance on *Pritchard* where, although plaintiff had been granted medical leaves of absence, plaintiff did not create genuine issues of fact as to whether she was substantially limited in any major life activity).

3. Regarded as Disabled

Under the "regarded as" prong, a plaintiff is disabled if her employer perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception. *Carruthers*, 357 F.3d at 1216 (citations omitted).  In order "for a plaintiff to prevail under this theory, he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant." *Rossbach*, 371 F.3d at 1360 (citing *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999)) (holding that police officers were regarded by the City as disabled with regards to the major life activity of work where the City placed the officers on light or limited duty, a title specifically reserved for disabled officers).  When a plaintiff claims he was regarded as disabled with regard to his ability to work, the plaintiff must show that his employer

33

perceived him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Carruthers*, 357 F.3d at 1216 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

There is no genuine issue of material fact on the question of whether Shepard was regarded as disabled by UPS. While UPS placed Shepard on medical leave after receiving Dr. Winton's and Dr. Cloyd's examination reports from August 2006, these reports gave no indication that Shepard was restricted from performing a broad class of jobs, and there is no evidence UPS believed this to be the case. As shown by UPS's offer to let Shepard return to work if he could obtain a doctor's release, UPS did not regard Shepard as disabled. *See Butler v. Greif Bros. Service Corp.*, 231 Fed. Appx. 854, 857 (11th Cir. Apr. 30, 2007) (where employer offered to let employee return to work if he could obtain a release from his doctor, concluding that, at most, the evidence established that employer perceived employee as unable to perform only his particular job). Moreover, where a defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of fact, a finding that plaintiff was regarded as disabled is inappropriate. *Hilburn*, 181 F.3d at 1230; *McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1498 (N.D. Ga. 1996) (where plaintiff was discharged because he could no longer perform the essential functions of his job due to his work restrictions, the court concluded that defendant did not regard the plaintiff as disabled as the defendant's perceptions of plaintiff's limitations was not an

34

erroneous perception but "a recognition of a fact called to defendant's attention by plaintiff's own physician").  It is undisputed that Shepard could not perform his job without the restrictions recommended by the doctor; in fact, Shepard himself complained of a worsening of his health condition when he began working in the warehouse in the summer of 2006.

As evidence that he was regarded as disabled, or that Shepard had a record of disability, Shepard points to the fact that numerous employees knew that Shepard had leukemia.[8]  (*See* Doc. 53 pp.11-12.)  However, knowledge of an employee's illness is not equivalent to regarding that employee as having a substantially limiting impairment as defined by the ADA.  Shepard also points to an email sent by Burnett, UPS's Occupational Health Supervisor for the Alabama district, to Donna Morrison, the Regional Occupational Health Supervisor and Burnett's supervisor, in which Burnett mentions Shepard's job restrictions as listed by Dr. Cloyd in his September 2006 correspondence to UPS.  (*See* Doc. 53-1.)  After listing Shepard's restrictions and Dr. Cloyd's opinion that Shepard is unable to meet the essential functions of his position unless accommodations are made, Burnett asks Morrison, "What do you suggest now? ADA?"  (*Id.*)  Shepard claims this email "indicat[es] Plaintiff was an individual with a disability who needed an accommodation."  (Doc. 53 at 12.)  However, in *Greene*, the court rejected a similar claim that a letter written by the UPS

---

[8]  Although Shepard includes the arguments in this paragraph in a "record of disability" discussion, the court finds them to be more appropriately discussed in a "regarded as" analysis, because they speak to the knowledge and views of others as to Shepard's condition.  Moreover, the court has already discussed that Shepard cannot create a genuine issue of material fact as to "record of" disability, where he has not shown a substantial limitation as to any one major life activity.

management to the EEOC investigator showed that management regarded the plaintiff as disabled.  125 F. Supp. 2d at 523.  The letter in *Greene* indicated that the plaintiff did not meet the essential functions of any job at the UPS Athens facility.  *Id.*  The court stated that the letter "does not create a genuine issue of material fact as to whether Plaintiff is regarded as unable to perform a class of jobs utilizing his skills," where the letter in its entirety reflected the manager's opinion that the plaintiff could not perform the jobs he requested because of his lifting restriction, but did not indicate that the defendant regarded plaintiff as unable to perform jobs without lifting restrictions, either at UPS or at other companies.  *Id.*  Similarly, Burnett's acknowledgment of Shepard's medical restrictions and his questioning about the ADA specifically focus on Shepard's issues with his Operations Clerk job, and does not create a genuine issue of material fact as to whether UPS regarded Shepard as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  *Carruthers*, 357 F.3d at 1216.

**b. Qualified Individual**

Because there is no genuine issue of material fact as to whether Shepard has a disability, real or perceived, he has not established a prima facie case.  Assuming, however, that he had made such a showing, UPS next argues that Shepard is not a "qualified individual" under the ADA, and therefore, cannot maintain a failure to accommodate claim. A "qualified individual with a disability" is an "individual with a disability who, with or

without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Davis*, 205 F.3d at 1305 (quoting 42 U.S.C. § 12111(8)). The plaintiff "bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).

Because the ADA does not require an employer to eliminate an essential function of an employee's job in order to accommodate him, the first step in determining whether Shepard is a qualified individual is determining the essential functions of his position at UPS. *Davis*, 205 F.3d at 1305. Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors, and consideration should be given to the employer's judgment as to a job's essential functions and the employer's written description for that job. *Id.* The ADA regulations provide that other factors to consider are: (1) the amount of time spent on the job performing that function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs. *Id.*

When he was moved to the warehouse in the summer of 2006, Shepard performed the duties of an Operations Clerk. This is also the position chosen by Dr. Winton in February 2007 in correspondence with UPS as being "the job Mr. Shepard would prefer." (Doc. 32-5 at 33.) It is undisputed that the essential functions of the Operations Clerk position occupied

by Shepard in September 2006 require the employee to be able to lift, lower, push, pull and manipulate equipment and packages weighing up to 70 pounds, assist in moving packages weighing up to 150 pounds, and work in an environment with variable temperatures and humidity, and exposure to dust, dirt, fuel, fumes, and noise, and inclement weather. These job duties appear in the job description for the Operations Clerk position, and UPS employees also testified that these duties are essential to the position. In various communications with UPS, Dr. Winton and Dr. Cloyd indicated that Shepard could only lift packages of these weights "occasionally" and could only be exposed to these environmental conditions infrequently for short durations. These limitations led Dr. Cloyd, UPS's doctor, to conclude that Shepard could not perform the essential job functions of the Operations Clerk position.

Modifications to a job description by the plaintiff's physician can be considered as evidence that a plaintiff cannot perform those job duties. *See Lucas*, 257 F.3d at 1259 (considering physician's modification of job description form in determining whether employee was "otherwise qualified" for the position); *Manigan v. Southwest Ohio Regional Transit Authority*, 385 Fed. Appx. 472 (11th Cir. July 22, 2010) (noting that, while it was unclear whether plaintiff claimed he could perform an essential function of the position, "[a]ny such argument would fail, however, in light of his doctor's restrictions"). Because Dr. Cloyd and Dr. Winton indicated that Shepard could not perform the essential functions of his job without an accommodation, Shepard bears the burden of identifying an

38

accommodation that would allow him to perform his duties and to establish that such accommodation was reasonable.  *Lucas*, 257 F.3d at 1255-56.  Shepard claims UPS should have accommodated him by returning him to perform clerical duties in the office or by transferring him to another position for which he was qualified.  Shepard admits that UPS accommodated him when he returned to work in July 2007 by allowing him to work under a fan in the warehouse and only requiring him to perform minimal lifting; however, Shepard claims that UPS had the necessary information to give such an accommodation as early as October 2006 and refused to utilize the information.  (Doc. 48-1 at 35.)

An employer is not required to accommodate an employee "in any manner in which that employee desires."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).  Reasonable accommodations include job restructuring, part-time or modified work schedules, reassignment to a vacant position, and acquisition or modification of equipment or devices.  *Lucas*, 257 F.3d at 1256.  The option of reassignment "does not require the employer to bump another employee from a position in order to accommodate a disabled employee."  *Id.*

Shepard's request to move back to the office was not reasonable. Where physical labor is an essential function of a position, an employee's request to be accommodated with a permanent desk job because of an inability to perform the physical labor is evidence that the employee is not "otherwise qualified" for the physically demanding position.  *Lucas*, 257 F.3d at 1259.  There is a dispute in the record regarding whether, under UPS or union

agreements, union employees are allowed to work in clerical office positions.  However, it is undisputed that the essential job functions of the union positions at the Roebuck Center require that an employee lift, lower, push, and pull equipment and packages weighing up to 70 pounds.  The ADA does not require the employer to provide an accommodation that contravenes a collective bargaining agreement in place.  *Davis*, 205 F.3d at 1307.  Therefore, even if UPS did violate its own policies on union positions at times by having union employees working in the office, the ADA does not require UPS to do so in order to provide an accommodation.  Moreover, Shepard has not met his burden of showing that a vacant position existed in the office in September 2006, when he was placed on medical leave.  *See Lucas*, 257 F.3d at 1257 (employer only required to reassign plaintiff to another position if another position is available).

Further, Shepard's request to be transferred to another position for which he was qualified, specifically "bad address, returns, damages, audits, corrections, decapping [or] airsort," (Doc. 1-1 at 6, Compl.), is not reasonable.  Shepard has not provided evidence showing that vacancies in any of these positions existed during the time period from August 2006 to July 2007, when he was on leave.  Shepard claims that a temporary employee was hired to fill a customer counter position while he was on leave, and that he should have been offered this position.  However, the record shows that an essential job function of the customer counter position requires lifting packages up to 70 pounds.  Shepard has not met his burden of presenting evidence to show that a vacant position existed for he which he was

qualified and for which he could perform the essential functions of the job. *See Lucas*, 257 F.3d at 1258 n.5 (noting that manager's speculation that he was "sure" that there were several available positions during the relevant time frame "falls far short of the evidence needed to establish that a specific reasonable accommodation, in the form of a vacant position, actually existed" and plaintiff did not demonstrate that he was "otherwise qualified" for those positions).

Shepard's request to perform his job with restrictions on the amount of weight he had to lift is also not reasonable because the ADA does not require employers to reallocate or eliminate essential job duties. *Davis*, 205 F.3d at 1305; *Lucas*, 257 F.3d at 1260 ("While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions, employer are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists.") (emphasis added). Although UPS eventually did allow Shepard to return to his work in the warehouse under lifting restrictions, this accommodation was not required by the ADA. *See Anderson v. Embarq/Sprint,* 379 Fed. Appx. 924, 928 (11th Cir. May 20, 2010) (per curiam) (employee's request to perform "light duty work" due to his reduced physical capacities was unreasonable because it would eliminate lifting, an essential function of his job).

Because Shepard has not demonstrated that he could perform the essential functions of his job with or without a reasonable accommodation, Shepard has not demonstrated that he is a qualified individual under the ADA.

### c. Accommodation

UPS next argues that, even assuming Shepard is "otherwise qualified," UPS did not deny him a reasonable accommodation. An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability, unless doing so would impose undue hardship on the employer. *Lucas*, 257 F.3d at 1255 (citing 42 U.S.C § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). The employer's motivation for denying a reasonable accommodation is irrelevant, as "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007) (emphasis in original); *see also Nadler*, 2007 WL 2404705, at *9 ("An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability. . . Thus, applying *McDonnell Douglas* to reasonable accommodation cases would be superfluous.") (emphasis in original).

First, as previously discussed, Shepard's proposed accommodations were not reasonable. Second, the court finds that UPS did fulfill its obligations under the ADA for handling accommodation requests. As soon as Shepard notified his supervisors that he was

having difficulty working in the warehouse, he was asked to submit medical documentation in order for UPS to gain more information about Shepard's condition.  Over a period of several months, UPS communicated multiple times with Dr. Winton and Dr. Cloyd in order to obtain the necessary information.  Further, once informed of Shepard's condition, UPS placed Shepard on medical leave while more information was sought and advised him how to seek short-term disability benefits. Since Shepard had received disability benefits while on leave from UPS in the past, it was reasonable for UPS to think he would receive them this time as well. Also, Shepard testified that UPS reimbursed him for his medical expenses incurred while on leave.

Shepard takes issue with being placed on leave because he had informed Jones and Burnett that he wanted to continue to continue working, but with restrictions as to the amount of lifting required.  However, where an employee cannot perform the essential functions of his job, an employer may place the employee on medical leave. *See Manigan v. Southwest Ohio Regional Transit Authority*, 385 Fed. Appx. 472 (11th Cir. July 22, 2010) (where employee objected to his being placed on medical leave as a result of informing his employer of his medical restrictions and wanted to continue to work, holding that employee failed to show that he was otherwise qualified to perform essential functions and affirming summary judgment for employer on ADA discrimination claim); *see also Moore v. Accenture, LLP*, 2007 WL 3313152, at *1 (11th Cir. 2007) (per curiam) (where employer accommodated plaintiff by placing him on leave of absence and continuing his insurance coverage, employer

43

had no duty to provide plaintiff with his choice of a different accommodation).  When Shepard returned to work in 2007, UPS paid him for lost income and also reimbursed medical expenses incurred while on leave.

Finally, UPS accommodated Shepard by allowing him to return to work in July 2007 under lifting and temperature conditions he could handle.  While it is disputed whether UPS actually created a new position for Shepard, it is undisputed that UPS did not require Shepard to lift more than 50 pounds in this role.  Therefore, UPS either  accommodated Shepard by removing the essential job function of lifting up to 70 pounds, placing him in a new role, or creating a position for him - none of which the ADA required UPS to do.  "An employer that 'bends over backwards to accommodate a disabled worker . . . must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'"  *Terrell v. USAir*, 132 F.3d 621, 627 n.6 (11th Cir. 1998) (quoting *Vande Zande v. Wisconsin Dept. of Administration*, 44 F.3d 538, 545 (7th Cir. 1995)).

Because Shepard has not provided sufficient evidence to show that he had a disability under the ADA in September 2006, that he was otherwise qualified to perform his job, or that he was denied a reasonable accommodation, summary judgment is due to be granted on Shepard's ADA claim.

## B.  Title VII: Race Discrimination[9]

Shepard claims that UPS discriminated against him on the basis of his race by treating similarly situated Caucasian employees more favorably. (Doc. 48-1 at 38.)  In his Complaint, Shepard alleges that "he was removed from his Clerical position and placed in a Pre-Load position because of his race, African American," while a Caucasian individual, Morrow, continued to perform Shepard's clerical duties. (Doc. 1-1 at 10.)  Shepard further alleges that "African American employees were subjected to discriminatory terms and conditions of employment and that the Defendant has a pattern and practice of discriminating against African Americans."[10]   (*Id.*)   In deposition testimony, Shepard also alleged that Jones discriminated against him by sending him home after he showed him the first letter from Dr. Winton regarding his medical restrictions.  (Doc. 32-4 at 214, Shepard Depo.)

Shepard does not allege that direct evidence of discrimination exists. Without direct evidence, plaintiff must prove his case using circumstantial evidence under the *McDonnell Douglas* framework and, as an initial step, establish a prima facie case of discrimination.  *See*

---

[9]  While Shepard sues under both Title VII and 42 U.S.C. § 1981, the analysis for a disparate treatment claim based on race is the same under § 1981 and Title VII.  *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).

[10]  The Complaint also alleges that Shepard was "subjected to racial harassment."  (Doc. 1-1 at 10.)  However, the Complaint contains no factual allegations of harassment, and plaintiff has not pursued this claim or presented any evidence to support it.  As pointed out by defendant, (Doc. 32-1 at 29 n.5), plaintiff testified in his deposition that Jones is the only person he accuses of race discrimination, (Doc. 32-4 at 212, 216), and that his discrimination claim is solely based on Jones's alleged failure to accommodate him when he began experiencing health problems after being moved out of the office (*id.* at 212-16).

*Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If plaintiff establishes a prima facie case of discrimination, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision.  *Id.*  If defendant is able to meet this burden, plaintiff then has the opportunity to demonstrate that defendant's proffered reason for the adverse employment action is merely a pretext for unlawful discrimination.  *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing *McDonnell Douglas Corp.*, 411 U.S. at 804).

### 1. Prima Facie Case

In this circuit –

> [A] plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [he] belongs to a racial minority; (2) [he] was subjected to adverse job action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [he] was qualified to do the job.'

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997) (citing *McDonnell Douglas Corp.*, 411 U.S. 792)) (internal quotations omitted); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006).

UPS contends that Shepard cannot prove the second, third, and fourth elements of his prima facie case.  First, UPS argues that Shepard did not suffer an adverse employment action.  An adverse employment action under Title VII requires that an employee experience a "serious and material change in the terms, conditions, or privileges of employment." *Davis*

*v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*  Changes in work assignments and negative job performance memoranda that do not cause negative economic injury are not evidence of an adverse employment action. *Id.*

Shepard does not allege that moving to the warehouse in the summer of 2006 caused a "serious and material change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239.  Rather, Shepard objects at the fact that he was moved from the office to a more physically demanding job.  (Doc. 48-1 at 40.)  No reasonable jury could find that Shepard's move to the warehouse "constituted a serious and material change" in the terms of Shepard's employment.  Thus, moving Shepard from the office to the warehouse was not an adverse employment action.  Also, placing Shepard on medical leave was not an adverse employment action, but rather a proper accommodation under the ADA, as previously discussed.  Therefore, the court agrees with UPS that Shepard did not suffer an adverse employment action.

Next, UPS argues that there is no evidence that UPS has treated similarly situated employees more favorably than Shepard.  At his deposition, Shepard confirmed that Jones is the only individual he claims discriminated against him on the basis of his race.  (Doc. 32-4 at 215-16, Shepard Depo.)  However, when asked who Jones treated more favorably in a

similar circumstance, Shepard only mentioned knowing about instances where a Caucasian employee cursed a supervisor and wasn't written up for it.  (Doc. 32-4 at 215, Shepard Depo.) Shepard's claim that Morrow, a white union employee, was allowed to stay in the office clerical position is controverted by Morrow's own testimony that he believes he was moved from the office the day after Shepard.  Accordingly, the court agrees that Shepard has not met his burden of proving that similarly situated non-minority employees were treated more favorably than he was.

Finally, as discussed in the previous section of this opinion, because of his medical restrictions with regards to lifting and the environmental conditions of the warehouse, Shepard has not shown that he was qualified for his job.  *See Anderson*, 379 Fed. Appx. at 929 (after holding that plaintiff was not a "qualified individual" for purposes of the ADA because he could not perform the essential functions of his position, using same conclusion to hold that plaintiff could not prove fourth prong of prima facie case under Title VII).

Because Shepard has not offered sufficient evidence to establish a prima facie case of racial discrimination, his Title VII and Section 1981 claims fail as a matter of law and summary judgment is due to be granted.

## C.  State law claims

### 1. Invasion of Privacy

48

Shepard claims that the single instance of Jones's asking him about his salvation constitutes an invasion of privacy.[11]  Specifically, Shepard claims that Jones "intentionally and maliciously intruded into Shepard's *emotional sanctum* by asking him how his salvation was immediately after Shepard informed Jones he would die if he continued to have to perform the unloading duties in the extreme heat in the warehouse."  (Doc. 48-1 at 42) (emphasis in original.)  Absent a public or commercial use of the private information, the standard for invasion of privacy is whether there has been an intrusion upon the plaintiff's physical solitude or seclusion, or an "intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Rosen v. Montgomery Surgical Ctr.*, 825 So. 2d 735, 737 (Ala. 2001); *Hogin v. Cottingham*, 533 So. 2d 525, 530 (Ala. 1988).  Wrongful intrusion is defined as the "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns." *Hogin*, 533 So. 2d at 531 (quoting Prosser, The Law of Torts (5th ed. 1984) at 851).  In determining whether the intrusion is actionable, courts should consider the means used in obtaining the information and the defendant's purpose for obtaining the information. *Id.*

As Shepard points out, the Alabama Supreme Court has held that "[o]ne's emotional sanctum is certainly due the same expectations of privacy as one's physical environment."

---

[11]  Although the Complaint alleges the offensive conduct was "continuous," (Doc. 1-1 at 13), Shepard's Complaint and his brief in opposition to summary judgment fail to mention any instance of offensive conduct aside from Jones's single question about Shepard's salvation.

*Phillips v. Smalley Maintenance Svcs., Inc.*, 435 So. 2d 705, 711 (Ala. 1983) (holding that invasion of privacy existed where defendant, plaintiff's employer, subjected female plaintiff to sexual demands and threats, including an inquiry as to the nature of sex between plaintiff and her husband, two to three times a week at work).   However, actions that are merely annoying or immature will not amount to an invasion of privacy claim where the behavior is not highly offensive to a reasonable person. *Martin v. Patterson*, 975 So. 2d 984 (Ala. Civ. App. 2007) (no invasion of privacy where defendants drove by plaintiff contractor's construction work site six times, honked the horn of their vehicle, yelled the mayor's name, and laughed).

Shepard alleges that Jones knowingly caused him harm by asking about his salvation, which he had "no reason or right to inquire" about, and smirked at Shepard after asking it. (Doc. 48-1 at 42; Doc. 32-4 at 141, Shepard Depo.)   Shepard also produced testimony showing that asking about one's faith or salvation would be considered a violation of UPS's policies.   (Doc. 32-12 at 65, Bundrum Depo.)   Under Alabama law, this evidence is insufficient to amount to invasion of privacy. No reasonable jury could find that a conversation about one's salvation, consisting of one question on one occasion, would cause "mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Rosen*, 825 So. 2d at 737.   Thus, Shepard's invasion of privacy claim fails as a matter of law, and summary judgment on this claim is due to be granted.

**2. Outrage/Intentional Infliction of Emotional Distress**

Shepard also claims that Jones's asking him about his salvation amounts to the tort of outrage, or intentional infliction of emotional distress.[12]  To establish an outrage claim, Shepard must prove that: (1) UPS either intended to inflict emotional distress, or knew or should have known that emotional distress would result; (2) UPS's conduct was extreme and outrageous;  and (3) the resulting emotional distress was so severe that no reasonable person should be expected to endure it.  *Stabler v. City of Mobile*, 844 So. 2d 555, 560 (Ala. 2002). The tort of outrage is a limited cause of action reserved for only the most egregious circumstances.  *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993) (finding defendants were not liable for outrage when they allegedly intentionally exposed plaintiff to insulation that they knew contained asbestos and failed to warn plaintiff of the asbestos).

No reasonable jury could find that Jones's asking Shepard about his salvation on one occasion amounts to an outrage claim.  The court need only examine the second element of the claim, that requires the conduct to be extreme and outrageous, to find that the claim fails. Extreme and outrageous conduct is "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Thomas*, 624 So. 2d at 1044.  Nothing about the single question asked by Jones reaches such a high standard of offensiveness so as to be

---

[12]  The tort of outrage is the same as the tort of intentional infliction of emotional distress. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041 (Ala. 1993).

"utterly intolerable." *Id.*  Cases that have presented actionable outrage claims have involved much more egregious and disturbing conduct.  *See, e.g.*, *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63 (Ala. 1986) (defendant undertaker's wrongful retention of the remains of plaintiff's husband to force payment of funeral expenses presented jury question as to claim of outrage); *Harrelson v. R.J.*, 882 So. 2d 317 (Ala. 2003) (affirming jury verdict for plaintiff, suing on behalf of her daughter, on intentional infliction of emotional distress claim brought against man who sexually assaulted daughter while sleeping over at a friend's house).

Because Shepard's outrage claim fails as a matter of law, summary judgment is due to be granted.

### 3. Negligent Hiring, Training, Supervision and Retention

Shepard claims that UPS is liable for negligent hiring, training, supervision, and retention because "[t]he record is replete with numerous members of management who were not trained regarding UPS's policies and/or the ADA, did not understand UPS's policies, failed to implement UPS's policies, or even consider UPS's policies in response to Shepard's request for an ADA accommodation."  (Doc. 48-1 at 43.)  In the Complaint, Shepard states that UPS "negligently hired, trained, supervised and retained the managers and/or supervisors who invaded the Plaintiff's privacy and engaged in outrageous conduct, and as a result of such, Plaintiff was caused to be harassed, forced to endure an invasive and hostile

environment, and to suffer outrage, mental anguish, shame, embarrassment and humiliation."
(Doc. 1-1 at 15.)

The Alabama Supreme Court has analyzed allegations of negligent hiring, retention, training and supervision as one tort. *Jones Exp., Inc. v. Jackson*, ___ So. 3d ___, 2010 WL 3724744, at *6 (Ala. Sept. 24, 2010). To prove a claim of negligent supervision, a plaintiff must show that the employer knew, or in the exercise of ordinary care should have known, that its employee was incompetent. *Gilmer v. Crestview Memorial Funeral Home, Inc.*, 35 So. 3d 585, 596 (Ala. 2009). An employer being sued for negligent supervision will not be held liable for its employee's negligence, as "negligence is not synonymous with incompetency." *Collins v. Wilkerson*, 679 So. 2d 1100 (Ala. Civ. App. 1996). The plaintiff must also prove wrongful conduct on the part of the employee which caused the plaintiff to suffer injury. *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Jackson*, 2010 WL 372744, at *6.

Applying these rules, Shepard's claim of negligent hiring, training, supervision and retention fails. The record contains no evidence to support the allegations in the Complaint that Shepard was the subject of hostility and harassment, or was forced to suffer shame, humiliation or embarrassment. Though Shepard does not state a specific underlying tort on the part of an employee that caused him injury, the court presumes he refers to the invasion of privacy and outrage allegations against Jones, as well as an alleged general lack of knowledge about the ADA and UPS policy on the part of UPS's employees. As noted above,

Shepard's claims of outrage and invasion of privacy fail as a matter of law. There is also no evidence to support Shepard's claim that his supervisors were so unfamiliar with UPS policy or the ADA as to be incompetent. Once Shepard informed UPS that working in the warehouse was aggravating his leukemia and causing his health to fail, UPS began an investigation into his medical condition by communicating with his doctors over a period of several months, having a UPS doctor examine him, and involving a team of UPS employees on the issue. UPS also granted Shepard paid leave and eventually reduced the amount that Shepard would be required to lift in order to allow Shepard to return to work. Shepard has not cited to any evidence of incompetence in the record. Accordingly, summary judgment is due to be granted with respect to Shepard's negligent hiring, training, supervision and retention claim.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 28th day of March, 2011.

*Sharon Lovelace Blackburn*

SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

54